UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

EMCYTE CORP.,

      Plaintiff,

v.                     Case No:  2:19-cv-769-JES-NPM

XLMEDICA, INC., and
ANNA STAHL,

      Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on Defendants' Motion to Dismiss, or in the Alternative, For a More Definite Statement (Doc. #70) filed on September 11, 2020. Plaintiff filed a Response in Opposition (Doc. #77) on September 25, 2020, to which Defendants file a Reply (Doc. #86) on October 15, 2020.  For the reasons set forth below, the motion is denied.

## I.

Plaintiff EmCyte Corporation (Plaintiff or EmCyte) initiated this lawsuit against defendants XLMedica, Inc., Anna Stahl, and Apex Biologix, LLC (collectively Defendants, or individually XLMedica, Stahl, or Apex). (Doc. #1).  The Second Amended Complaint (Doc. # 22) (SAC) alleges that EmCyte is the world leader in Platelet Rich Plasma (PRP) and Progenitor Stem Cell Biologics. (Doc. #22, ¶ 1.)  For over 20 years, EmCyte has manufactured blood concentrating systems, and develops, improves, and commercializes

1

state-of-the-art devices used in preparing autologous platelet rich plasma from blood samples and bone marrow. (Id. at ¶¶ 12-13, 15.) The SAC alleges that Plaintiff's blood concentrating systems include the PURE PRP® SupraPhysiologic (PURE PRP) and PURE BMC™ SupraPhysiologic (PURE BMC) products, both of which are protected under federal, state, or common law trademark and unfair competition laws. (Id. at ¶¶ 14, 16(Figure 1), 17, 19(Figure 2), 20(Figure 3), 27.) Plaintiff has continuously and extensively promoted its trademarked products in interstate commerce in connection with blood concentrating products since March 13, 2012. (Id. at ¶¶ 22, 24.)

The SAC further alleges that defendant Stahl, a former EmCyte employee and distributor, founded XLMedica to directly compete with EmCyte. (Doc. #22, ¶¶ 38, 41-45.) Stahl and XLMedica undertook a multifaceted trademark infringement and unfair competition campaign squarely aimed at EmCyte and its customers by selling products offered under infringing marks, i.e. PURE PRP KIT and PURE BMA CONCENTRATION KIT, or confusingly similar variants (Infringing Marks) that usurp the goodwill associated with EmCyte's trademarks. (Id. at ¶¶ 43-45, 51 (Figures 6 and 7.))

The SAC sets forth the following remaining claims: trademark infringements in violation of 15 U.S.C. § 1114 (Count I); contributory trademark infringements under § 1114 and common law (Count II); unfair competition under the Lanham Act, 15 U.S.C. §

1125(a) (Count III); common law unfair competition (Count IV); infringement of Florida TM No. T19000001087 (Count V).[1] Plaintiff seeks injunctive relief to prohibit XLMedica and Stahl from using the Infringing Marks and engaging in unfair competition, a declaratory judgment related to its trademarks, compensatory and punitive damages, and reasonable attorney's fees. (Id., pp. 24-26.)

## II.

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted). To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level." Id. See also Phx. Entm't Partners, LLC v. Casey Rd. Food & Bev., LLC, 728 F. App'x 910, 912 (11th Cir. 2018). This requires "more than an unadorned, the-defendant-

---

[1]Count VI related only to a defendant which has been dismissed (Docs. #63, 65), and therefore will not be further discussed.

unlawfully-harmed-me accusation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, <u>Erickson v. Pardus</u>, 551 U.S. 89, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth." <u>Mamani v. Berzaín</u>, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678. "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." <u>Chaparro v. Carnival Corp.</u>, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal citations omitted). Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 556 U.S. at 679.

### III.

#### A. Count I and Count III

The SAC asserts claims of trademark infringement (Count I) and unfair competition (Count III) under the Lanham Act, 15 U.S.C. § 1051 <u>et seq.</u>  <u>See</u> 15 U.S.C. § 1114 (infringement), § 1125(a)

(unfair competition); (Doc. #22, ¶¶ 70-80, 90-97.) "The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish between competing producers." Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 198 (1985); see also Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc., 872 F.3d 1256, 1260 (11th Cir. 2017).

In order to succeed on the merits of a trademark infringement claim under § 1114 or § 1125(a), a plaintiff must show "(1) its mark was used in commerce by the defendant without the [plaintiff's] consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive." Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1241 (11th Cir. 2007); see also Savannah Coll. of Art & Design v. Sportswear, Inc., 983 F.3d 1273, 1279 (11th Cir. 2020); Hard Candy, Ltd. Liab. Co. v. Anastasia Beverly Hills, Inc., 921 F.3d 1343, 1352 (11th Cir. 2019) (noting that "an unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim.").

**(1) Use Of Plaintiff's Mark In Commerce Without Consent**

Defendants argue that EmCyte has failed to state a claim under § 1114 or § 1125(a) of the Lanham Act because Plaintiff has not alleged that Defendants actually used EmCyte's trademarks. (Doc. #70, pp. 3-4.) In particular, Defendants contend that Plaintiff's

5

registered PURE Marks are expressly limited to the specific combination of words and images registered with the U.S. Trademark and Patent Office (USTPO), with a disclaimer that "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "PURE PRP" [or "PURE BMC"] APART FROM MARK SHOWN."[2] (Id., p. 4.) Defendants argue that the USTPO's disclaimer clearly establishes that the words "PURE PRP" and "PURE BMC" are only descriptive, and are not protectable apart from the images which Plaintiff ultimately registered. (Id., pp. 5-6.) Defendants therefore argue that Plaintiff's allegations that Defendants' PURE PRP KIT and PURE BMA CONCENTRATION KIT infringe upon EmCyte's trademarks are insufficient since their products only contain the unprotected words "PURE" and "PRP", without the registered images. (Id., pp. 7-8.)

Defendants are correct that "[t]he descriptive portions of a mark can be disclaimed, [however,] the entire composite mark, including the descriptive terms, is considered for purposes of infringement." See Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1065 (3d Cir. 1991) (quoting Schwarzkopf v. John H. Breck, Inc., 52 C.C.P.A. 957, 340 F.2d 978, 979-80, 144 U.S.P.Q. 433 (C.C.P.A.

_____

[2] Defendants have provided the Court with records from the U.S. Patent and Trademark Office, as well as records related to trademark registration with the State of Florida, and request the Court take judicial notice of such records. See (Doc. #69). The Court will do so. Horne v. Potter, 392 F. App'x 800, 802 (11th Cir. 2010).

1965)); see, e.g., Estate of P.D. Beckwith, Inc. v. Commissioner of Patents, 252 U.S. 538, 545-46 (1920) ("The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail."); Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 362 (11th Cir. 1997) ("the validity of a composite mark is determined by looking at the mark as a whole."). Thus, the Court will consider whether Plaintiff has stated a plausible claim for trademark infringement by examining the entirety of Plaintiff's alleged protected marks, which may or may not include disclaimed portions.

The SAC alleges that EmCyte's PURE PRP trademark and logo are protected by Florida Trademark Registration No. T19000001087, and incontestable U.S. Trademark Registration No. 4,243,377. (Id. at ¶¶ 16-17.) Likewise, Plaintiff's "PURE BMC" word mark is protected by federal and Florida common law, and the PURE BMC logo mark is protected by U.S. Trademark Registration No. 4,623,644. (Id. at ¶¶ 19-20.) Plaintiff alleges that the U.S. trademark protects Plaintiff's "PURE PRP" mark with a syringe image placed in a bullseye design (PURE PRP logo) and the "PURE BMC" mark with the depiction of blood platelets (PURE BMC logo), and has provided pictures of the same within the SAC. (Id. at ¶¶ 16(Figure 1), 19(Figure 2), 20(Figure 3), 21.) Plaintiff asserts that as a result of EmCyte's continuous and extensive use of the "PURE PRP" and "PURE BMC" word marks in commerce, common law rights have been

7

attributed to EmCyte for these word marks, and that the word marks together with the PURE PRP and PURE BMC logos, i.e. PURE Marks, are distinctive trademarks of EmCyte's products. (Id. at ¶¶ 22-23.) Taking the allegations as true, and viewing them in a light most favorable to Plaintiff, the Court finds that EmCyte has alleged facts sufficient to show that the PURE Marks (the word marks and logos) are trademarked, and that EmCyte has ownership of the PURE PRP and PURE BMC trademarks.

Further, the SAC alleges that Defendants used EmCyte's PURE Marks, or confusingly similar variants of the PURE Marks. (Doc. #22, ¶ 43.) The SAC asserts that Defendants' use of the Infringing Marks, including both "PURE PRP" and "PURE BMA", infringe upon Plaintiff's federal registrations, which protect the PURE PRP and PURE BMA logos in their entirety. (Id. at ¶¶ 71-72.) The SAC further asserts that Defendants have knowingly and without EmCyte's consent, sold products in interstate commerce using the "PURE PRP" and "PURE BMA" marks, "which are identical in all material respects to EmCyte's PURE Marks." (Id. at ¶¶ 58-59, 74-75.) The SAC alleges that Defendants were aware of EmCyte's senior trademark rights to the PURE Marks when Defendants selected and began using the Infringing Marks, i.e. PURE PRP KIT and PURE BMA CONCENTRATION KIT, in commerce. (Id. at ¶¶ 51(Figures 6 and 7), 59.) The SAC also alleges that upon information and belief, Defendants selected the "PURE PRP" and "PURE BMA" marks and opted

to offer a substantially similar line of products with the intent of deriving benefit from EmCyte's reputation and goodwill. (Id. at ¶ 76.)  Accepting all of these factual allegations as true, the Court finds Plaintiff has plausibly alleged that Defendants used EmCyte's PURE PRP and PURE BMC trademarks, or very similar marks, in interstate commerce without Plaintiff's consent. See Optimum Techs., Inc., 496 F.3d at 1241.

**(2) Likely To Cause Confusion Or Mistake Or To Deceive**

As stated above, trademark infringement requires Plaintiff to plausibly show the unauthorized use of the mark is likely to cause confusion among consumers.  See Dunkin' Donuts Inc., 139 F. Supp. 2d 147, 158 (D. Mass. 2001). "[T]he closer the marks are, the more likely reasonable consumers will mistake the source of the product that each mark represents." Frehling Enters., Inc. v. Int'l Select Grp., Inc., 192 F.3d 1330, 1337 (11th Cir. 1999). "It is well settled that the disclaimed material still forms a part of the mark and cannot be ignored in determining likelihood of confusion." Lone Star Steakhouse & Saloon, Inc., 106 F.3d at 363 (quoting Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570 (Fed. Cir. 1983)). Although "the likelihood of confusion is generally a question of fact," Garden Meadow, Inc. v. Smart Solar, Inc., 24 F. Supp. 3d 1201, 1212 (M.D. Fla. 2014), the Court may determine whether a likelihood of consumer confusion has been sufficiently alleged. See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC, No.

8:15-cv-990-T-23TGW, 2015 U.S. Dist. LEXIS 149754, at *6-7 (M.D. Fla. Nov. 4, 2015).

The Eleventh Circuit has identified seven factors to consider when analyzing whether a likelihood of confusion exists between two marks:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

Savannah Coll. of Art & Design, 983 F.3d at 1280-1281. The court need not consider all factors in every case. See id. at 1281. While "the type of mark and the evidence of actual confusion are the most important" of all the factors, Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc., 830 F.3d 1242, 1255 (11th Cir. 2016), the court may "accord weight to the individual likelihood-of-confusion factors based on what the situation calls for and [need] not simply calculate the number of factors favoring such a conclusion and the number of factors militating against it." Savannah Coll. of Art & Design, 983 F.3d at 1281. The Court will consider each factor in turn.

### Factor 1—Strength of Plaintiff's Mark

The court should assess the strength of a mark in two ways. FIU Bd. of Trs., 830 F.3d at 1256. First, by classifying a mark as "generic," "descriptive," "suggestive," or "arbitrary," with each one more heavily protected than the last. See id. Second, the Court considers "the degree to which third parties make use of the mark." Id. at 1257. "The less that third parties use the mark, the stronger it is, and the more protection it deserves." Id.

The SAC alleges only that the PURE Marks are "distinctive," but does not make any allegations about the classification of the PURE Marks. (Doc. #22, ¶ 23.) Likewise, the SAC does not allege any facts to show the extent that third parties use the PURE Marks. See (Doc. #22.)

### Factor 2—Similarity of the Marks

"The similarity of design is determined by considering the overall impression created by the marks as a whole rather than simply comparing individual features of the marks." John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 975 (11th Cir. 1983). See also Custom Mfg. & Eng'g, Inc. v. Midway Servs., 508 F.3d 641, 648 (11th Cir. 2007).

The SAC alleges that Defendants' infringing "PURE PRP" and "PURE BMA" marks are confusingly similar to Plaintiff's "PURE PRP" and "PURE BMC" Marks, "as a whole" and "are identical in all material respects." (Doc. #22, ¶¶ 58, 73.) The SAC contains images

of Plaintiff's PURE Marks, as well as Defendants' PURE PRP and PURE BMA marks, which provide evidence of similar sounding words such as "PURE PRP", and that Defendants also capitalized the words "PURE PRP" and "PURE BMA", similar to that of Plaintiff's "PURE PRP" and "PURE BMC". (Id. at ¶¶ 16, 19, 51.) Finally, Defendants use wording that is very similar to Plaintiff's trademarks, i.e. PURE PRP, and PURE BMA as opposed to Plaintiff's PURE BMC.

**Factor 3—Similarity of the Parties' Products and Services**

The third factor asks whether the parties' respective goods are "so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." FIU Bd. of Trs., 830 F.3d at 1261 (quoting Frehling Enters., 192 F.3d at 1338). The focus is on "'the reasonable belief of the average consumer as to what the likely source of the goods [is].'" Id.

The SAC alleges that since March 2012, EmCyte has used and promoted its PURE Marks in interstate commerce in connection with the blood concentrating products, and by virtue of its long-time, widespread and exclusive use of the PURE Marks in connection with its products, consumers, vendors, competitors and others in the blood industry have come to associate products bearing the PURE Marks exclusively with EmCyte's PURE PRP® and PURE BMC™ products. (Doc. #22, ¶¶ 24-26.) The SAC likewise alleges that customers and industry studies have referred to EmCyte's products by using just the "PURE PRP" word mark. (Id. at ¶ 39.) The SAC further asserts

that the Defendants' commercial advertising and promotion of the Infringing Products under the Infringing Marks are likely to deceive or confuse customers about any affiliation, connection, or association of Defendants with EmCyte. (Id. at ¶¶ 92-93.)

**Factor 4—Similarity of the Parties' Sales Outlets & Customers**

The fourth factor takes into consideration where, how, and to whom the parties' products are sold. FIU Bd. of Trs., 830 F.3d at 1261 (quoting Frehling Enters., 192 F.3d at 1339). "The parties' outlets and customer bases need not be identical, but some degree of overlap should be present for this factor to support a finding of likelihood of confusion." Id. "The greater the similarity between the products and services, the greater the likelihood of confusion." Haneys Cafe, Inc. v. Haney's Smokehouse, Inc., No. 2:04-cv-458-FtM-29SPC, 2004 U.S. Dist. LEXIS 24959, at *12 (M.D. Fla. Nov. 2, 2004).

The SAC alleges that Plaintiff has used and promoted its PURE Marks in interstate commerce in connection with blood concentrating products, and that Defendant's Infringing products it sells or offers for sale, is in direct competition with EmCyte's PURE PRP and PURE BMC products. (Doc. #22, ¶¶ 24, 60.) The SAC asserts that Defendants' Infringing Products offered under the Infringing Marks are sold through the same or similar channels of trade as EmCyte's trademarked products, and to the same or similar types of customers or consumers as those who purchase products

sold under EmCyte's PURE Marks. (Id. at ¶¶ 62-63.) The SAC also alleges that Defendants advertise and promote for sale its Infringing Products, i.e. PURE PRP and PURE BMA KITS on XLMedica's website, and that defendant Stahl has deliberately directed promotions for XLMedica's products to EmCyte's customers she called on while employed by EmCyte. (Id. at ¶¶ 51(Figures 6-7), 52, 68.)

**Factor 5—Similarity of Advertising Methods**

This Factor requires a comparison of the parties' advertisements and the audiences they reach. FIU Bd. of Trs., 830 F.3d at 1262. With respect to advertising methods, "the standard is whether there is likely to be significant enough overlap in the [audience of the advertisements] that a possibility of confusion could result." Frehling Enters., 192 F.3d at 1340.

The SAC alleges that the Infringing Products offered by Defendants under the Infringing Marks are advertised through the same or similar advertising channels used by EmCyte in the sale of products bearing the PURE Marks, and sold in direct competition with EmCyte's PURE PRP® and PURE BMC™ products. (Id. at ¶¶ 60, 64.)

**Factor 6—Defendants' Intent**

Factor Six asks the Court to determine "whether the defendant had a conscious intent to capitalize on [the plaintiff's] business reputation, was intentionally blind, or otherwise manifested

14

improper intent." <u>Custom Mfg. & Eng'g, Inc.</u>, 508 F.3d at 648 (internal quotations omitted). "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." <u>FIU Bd. of Trs.</u>, 830 F.3d at 1263.

The SAC alleges that defendant Stahl, who has been employed by EmCyte and distributed its goods for years, was aware of EmCyte's senior trademark rights and that customers and industry studies referred to EmCyte's products by using the "PURE PRP" word mark. (Doc. #22, ¶¶ 38-39.) It is further alleges that Stahl deliberately directed promotions for XLMedica's products to EmCyte customers while she worked for EmCyte, and selected the Infringing Marks with bad faith intent to create customer confusion after years of promoting and selling EmCyte's products under the PURE Marks. (<u>Id.</u> at ¶¶ 66, 68, 74.) The SAC also asserts that Defendants selected the Infringing Marks and opted to offer a substantially same line of products with the intent of deriving benefit from EmCyte's stellar reputation and goodwill. (<u>Id.</u> at ¶¶ 44, 76.)

**Factor 7—Existence of Actual Confusion**

"Evidence of confusion by actual or potential customers is, of course, the best evidence of a likelihood of confusion." <u>FIU Bd. of Trs.</u>, 830 F.3d at 1264. "[T]he quantum of evidence needed to show actual confusion is relatively small." <u>Id.</u> "Short-lived

confusion or confusion of individuals casually acquainted with a business is worthy of little weight, . . . while confusion of actual customers of a business is worthy of substantial weight." <u>Id.</u>

The SAC has generally alleged that confusion or mistake, or deception is likely to result from Defendants' knowing and impermissible use of Infringing Marks in interstate commerce. (Doc. #22, ¶¶ 45, 66, 68, 75). There are no allegations that such use has caused actual confusion with Emcyte's customers or consumers.

After considering the seven factors listed above, the Court finds the allegations set forth in the SAC, taken as true, are sufficient to plausibly show that Defendants' unauthorized use of the mark is likely to cause confusion among customers or consumers. Accordingly, the Court denies Defendants' Motion to Dismiss Count I—trademark infringement and Count III—unfair competition under the Act.

**B. Count II**

Count II alleges a contributory trademark infringement claim against defendant Stahl under § 1114 of the Act and common law. (Doc. #22, ¶¶ 81-89.) Defendants argue that Plaintiff's contributory trademark claim must be dismissed because Plaintiff has failed to allege that defendant Stahl has committed direct trademark infringement under the Act. (Doc. #70, p. 10.)

Defendants' argument is based upon its continued assertion that Plaintiff cannot establish XLMedica and Stahl infringed upon a trademark to which Plaintiff disclaimed any exclusive right, i.e. the words "PURE PRP" and "PURE BMC", or which Plaintiff has not alleged it has previously used, such as "PURE BMA". (Id.) The Court disagrees.

"Liability under the Lanham Act may be imposed not just on direct infringers, but also on those who induce or facilitate the infringing conduct of others." Coach, Inc. v. Swap Shop, Inc., 916 F. Supp. 2d 1271, 1278 (S.D. Fla. 2012)(citing Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-55 (1982)). "A claim for contributory trademark infringement thus has two elements: (1) a person or entity commits direct trademark infringement under the Lanham Act; and (2) the defendant (a) "intentionally induces" the direct infringer to commit infringement, (b) supplies a "product" to the direct infringer whom it "knows" is directly infringing (actual knowledge), or (c) supplies a "product" to the direct infringer whom it "has reason to know" is directly infringing (constructive knowledge)." Luxottica Grp., S.p.A. v. Airport Mini Mall, Ltd. Liab. Co., 932 F.3d 1303, 1312 (11th Cir. 2019).

As discussed above, the Court finds that the SAC has alleged sufficient facts to assert a plausible claim for direct trademark infringement against Defendants. With respect to inducement or supplying an infringing product, the SAC alleges that Stahl used

EmCyte's PURE Marks to market and sell the products while employed by Plaintiff and was aware that the PURE Marks were trademarked. (Doc. #22, ¶¶ 38-39, 61-62.) It is further alleged that Stahl selected the Infringing Marks, and that XLMedica, under the direction and control of Stahl, offered for sale the PURE PRP and PURE BMA Kits under the Infringing Marks. (Id. at ¶¶ 52, 66-67.) The SAC therefore asserts that defendant Stahl, who is the sole owner of XLMedica, "actually knows or has reason to know that Defendant XLMedica is engaging in trademark infringement given the open and notorious character of XLMedica's infringing conduct, and her direction and control of such infringement." (Id. at ¶¶ 3, 86.) It may reasonably be inferred from these allegations that defendant Stahl knew or had reason to know that XLMedica was engaged in trademark infringement, and that she supplied the infringing product to XLMedica. See Coach, Inc. v. Swap Shop, Inc., 916 F. Supp. 2d at 1278. The Court therefore finds the the SAC states a plausible claim of contributory trademark infringement, and denies Defendants' Motion to Dismiss Count II of the Second Amended Complaint.

### C. Count IV and Count V

The SAC also brings claims for unfair competition (Count IV) and trademark infringement (Count V) under Florida common law. (Doc. #22, ¶¶ 98-116.) The legal standard for unfair competition and trademark infringement under both the Lanham Act and common

law has been held to be essentially the same.[3] Compulife Software, Inc. v. Newman, 959 F.3d 1288, 1316 n.18 (11th Cir. 2020). "Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1345 (11th Cir. 2012).

Because the SAC establishes a plausible federal trademark infringement and unfair competition claim under the Lanham Act, the Court finds Plaintiff has sufficiently pled claims for both these causes of action pursuant to Florida common law as well. See Custom Mfg. & Eng'g, Inc., 508 F.3d at 652-53 (finding Florida claims were extinguished following the plaintiff's failure to establish likelihood of confusion as to the Lanham Act claim since "the analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under

---

[3] "To establish a claim for unfair competition, Florida law 'requires that [Plaintiff] establish deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion.'" Regent Grand Mgmt. v. Tr. Hosp'y LLC, No. 18-21445-Civ, 2018 U.S. Dist. LEXIS 212049, at *15 (S.D. Fla. Dec. 14, 2018) (quoting Donald Frederick Evans and Assocs. v. Continental Homes, Inc., 785 F.2d 897, 914 (11th Cir. 1986)). The elements of a claim for trademark infringement under Florida law are as follows: (1) plaintiff has a valid trademark registered under Florida law; (2) defendant used an identical or similar mark in commerce without plaintiff's consent; (3) defendants' use postdates plaintiff's use; and (4) defendants' use is likely to cause confusion. Fla. Stat. § 495.131; Canon U.S.A., Inc. v. Morrison, No. 6:13-cv-1574-Orl-37DAB, 2014 U.S. Dist. LEXIS 201151, at *8 (M.D. Fla. May 1, 2014)(citing § 495.131).

the federal trademark infringement claim."). Accordingly, Defendants' motion to dismiss Counts IV and V are denied.

## IV.

In the alternative, Defendants request a more definite statement as to Plaintiff's "claims," arguing that the SAC seeks to hold Defendants liable for use of marks to which Plaintiff either does not have any exclusive right, or has not alleged that Defendants used the mark. (Doc. #70, p. 13-14.) This request is denied.

Pursuant to Federal Rule of Civil Procedure 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). See also Euro RSCG Direct Response, LLC v. Green Bullion Fin. Servs., 872 F. Supp. 2d 1353, 1358 (S.D. Fla. 2012) (quoting Ramirez v. FBI, No. 8:10-cv-1819-T-23TBM, 2010 U.S. Dist. LEXIS 132271, 2010 WL 5162024, at *2 (M.D. Fla. Dec. 14, 2010)) ("A Rule 12(e) motion is appropriate if the pleading is so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith, without prejudice to [itself].").

Defendants appear to seek a more definite statement not because the SAC allegations are vague or ambiguous, but because they disagree that Plaintiff owns any trademarks which are the same or similar to the Defendants' purported marks. However, this

argument does not support such a request.  See Euro RSCG Direct
Response, 872 F. Supp. 2d at 1358 ("[A Rule 12(e)] motion is
intended to provide a remedy for an unintelligible pleading, rather
than a vehicle for obtaining greater detail.").  The SAC has
provided sufficient facts about its alleged trademarks, the
Defendants purported infringement, and the specific claims
Plaintiff brings against the Defendants under the Lanham Act and
Florida common law. The information is sufficient to allow
Defendants to formulate a response. The Court therefore denies
Defendants' request for a more definite statement.

Accordingly, it is now

**ORDERED:**

Defendants' Motion to Dismiss, or in the alternative Motion
For a More Definite Statement (Doc. #70) is **DENIED.**

**DONE AND ORDERED** at Fort Myers, Florida, this   4th   day of May,
2021.


<u>                 </u>
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE



Copies:
Counsel of record