UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

**EMCYTE CORP.**,

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　　　　　2:19-cv-769-JES-NPM

**XLMEDICA, INC.**, and **ANNA STAHL**,

    Defendants / Counterclaimants,

v.

**EMCYTE CORP.** and **PATRICK PENNIE**,

    Counterclaim Defendants.

---

## DISCOVERY ORDER

This action presents a trademark-infringement suit and a tortious-interference countersuit. But so far, the action has been commandeered by discovery disputes. While neither side is entirely blameless, fault for the discovery logjams and inordinate delays lies almost exclusively with defendants Anna Stahl and her company XLMedica. Among numerous examples that could be cited, they were rather coy about and ultimately refused to give EmCyte the address of Stahl's twin sister and business partner Angel Oliferuk (even though Oliferuk resided with Stahl, as EmCyte eventually discovered), and EmCyte had to go so far as to obtain court orders—or at least move to compel—to get Stahl, Oliferuk, and another business

partner, Susie Lopez,[1] to appear for depositions.

Defendants' tendency to be less than straight with the court just makes matters worse. We were told—repeatedly—that XLMedica is nothing more than a moribund "one woman shop," only to learn that XLMedica is in fact a robust enterprise supported by a multi-state sales force and marketing, promotion, and financial personnel.[2] We were told—repeatedly—that Defendants did not have any more documents responsive to discovery requests, only to learn that they simply didn't look for documents where any reasonable person would (such as Lopez's and Oliferuk's files) or reasonably search the files of other custodians.[3] And now, we are faced with Defendants' contumacious refusal to comply with a crystal-clear directive stated repeatedly by the court: to provide EmCyte a copy of the entire native file of XLMedica's Quickbooks data.

We first tried to unloose this Gordian knot during a March 2021 discovery hearing, in which the court ordered Stahl to appear for her deposition, ordered XLMedica to produce the native file of its Quickbooks data, and ordered both Stahl and XLMedica to produce other documents and supplement their interrogatory answers. (Docs. 107, 110). In October 2022—immediately after the courthouse was

---

[1] Lopez is such a critical figure to Defendants' enterprise that, by their own account, they would suffer "irreparable harm" if she were to discontinue working with them. *See* Doc. 258 at 3, 7.

[2] Among other things, see generally Doc. 274.

[3] *Id*. Especially pages 155-164, 167-170, 174-175, 207.

struck by the eyewall of Hurricane Ian—the court held a status conference and disposed of a second round of discovery motions. (Docs. 228, 229, 234, 235, 237). Among other things, the court ordered the parties to exchange detailed descriptions about the methods employed to identify and produce responsive documents, to produce certain documents, and to continue conferring about their respective document requests; ordered XLMedica (once again) to supplement its interrogatory answers; and rejected Defendants' request to allow them to unilaterally amend the parties' stipulated confidentiality agreement. (Doc. 237). And because Defendants had steadfastly certified—unjustifiably and in bad faith—that they had "no responsive documents" after deliberately using an unreasonable plan to identify, collect, and produce responsive documents, the court found EmCyte entitled to a fee-and-expense award for having to litigate this discovery violation. (Doc. 246).

But two issues remained: determining a reasonable amount for this award and deciding who should have to pay it—Defendants, their counsel, or both. So the court directed EmCyte to quantify the fees and expenses related to its sanctions motion, and it directed Defendants to appear in person for an evidentiary hearing. (Docs. 237, 246). Purported conflicts were presented about Defendants' availability for the evidentiary hearing (Doc. 258), and thus, the court instead conducted a full-day status conference with the parties' counsel in December 2022 to narrow the issues in dispute and steer their discovery efforts to a conclusion. (Docs. 262, 263, 271).

The record developed during the December 2022 conference confirmed Defendants' document-production efforts were improper, and their discovery certifications were unjustified. For example, after the October 2022 hearing, Defendants produced about 1600 pages of non-duplicative and responsive documents from the files of Lopez and Oliferuk—custodians whose files would have been searched by any reasonable and good-faith litigant from the very beginning.[4] With the sustained pattern of unreasonable intransigence in response to various discovery requests despite the multiple changes in counsel for the defense, the conference also confirmed that Defendants, rather than their counsel, should bear the brunt of the fee award to EmCyte for having to litigate this issue. Finally, the conference confirmed that fact discovery was substantially complete.

Surprisingly, the production of the native file of XLMedica's Quickbooks data remained at issue. Defense counsel reported that—for eventual production to EmCyte—Stahl had given the file to her prior counsel (the second of her three sets of lawyers who have represented her in this matter), but they could not confirm that it was ever furnished to EmCyte. And they resisted the production of any complete,

---

[4] In fact, between the October 2022 and December 2022 hearings in this matter, the defendants produced an additional 4,469 pages of documents (almost double what they produced before). *See* Doc. 250 at 3, 5. This substantial production of documents belied not only Defendants' discovery responses, but their representations to the court in opposition to EmCyte's motion for sanctions. *See*, *e.g.*, Doc. 152 at 12 ("EmCyte's mere wish for more documents or suspicion that 'there must be more' does not change the reality that there is not more."); *id.* at 14 ("Much to EmCyte's dismay, Defendants cannot produce what they do not have.").

native-file updates going forward. But the court declined their invitation to revisit its prior ruling, rejected their suggestions that only truncated or filtered sets of data should be provided instead, and directed them to produce the entire native file within two weeks and to continue sending a complete copy of the entire native file every month thereafter.

On the eve of the full-day status conference, Defendants filed a motion for sanctions against EmCyte concerning its document-production certifications, and this motion remains pending. (Doc. 245). In the time since the conference, Defendants have also filed a motion for a protective order concerning non-party subpoenas that EmCyte has directed to certain financial institutions. (Doc. 281). And because Defendants continue to defy the court's orders directing them to produce the entire native file of the Quickbooks dataset, EmCyte has filed a motion requesting an evidentiary hearing to determine an appropriate sanction. (Doc. 279).

## I. Quantifying an Appropriate Expense-of-Motion Award for Defendants' Improper Document-Production Practices

Having determined that EmCyte is entitled to a fee-and-expense award for its discovery-violation motion (Doc. 142) and that this sanction should be assessed against Defendants, rather than their counsel, we are left with determining an appropriate amount to be paid. EmCyte seeks $37,566. (Doc. 257). XLMedica and Stahl argue the award should be in the neighborhood of $3,000 - $5,000. (Doc. 269 at 19). Falling in between, the court imposes an $11,329 sanction against the

defendants.

The lodestar method guides the analysis for arriving at a reasonable sanction. The lodestar figure is the product of a two-step, fact-intensive, and case-specific inquiry, asking: (1) what would a lawyer in this division assess a paying client per hour to provide representation comparable to the legal skill, expertise, and acumen supplied for the matter at hand, and (2) practicing good billing judgment, how many hours would it have been appropriate for the lawyer to bill such a client for the services at issue? *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551-553 (2010); *City of Burlington v. Dague*, 505 U.S. 557, 562-67 (1992); *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299-1302 (11th Cir. 1988).

### A.    Reasonable hourly rate

"[A] reasonable hourly rate is the prevailing market rate in the relevant legal community." *Norman*, 836 F.2d at 1299 (internal citations omitted). The court "is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Id*. at 1303 (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)). At bottom: "It is the job of the district court in a given case to interpolate the reasonable rate based on an analysis of the skills . . . exhibited by the attorney in the case at bar. . .." *Id*. at 1301.

EmCyte requests an hourly rate of $570 for attorney Alejandro Fernandez and

$450 for attorney Kateryna Karpenko. Defendants counter with $350-400 for Fernandez and $275 for Karpenko. Notwithstanding EmCyte's arguments, this document-production issue could arise in any civil matter and presents a relatively straightforward question. Considering the circumstances of this case and the local market for the services provided, the court finds that $400 is a reasonable hourly rate for this discovery dispute.

### B. Reasonable number of hours

The second step in computing the lodestar is determining the reasonable number of hours expended. "Time spent is reasonable, and thus compensable, if it would be proper to charge the time to a client." *In re Home Depot Inc.*, 931 F.3d 1065, 1087 (11th Cir. 2019). Since it is "the duty of the courts to see that excessive fees and expenses are not awarded," the fee applicant's timesheets must be viewed from the perspective of a cost-sensitive client, and if such a client would refuse to authorize the work or balk at certain entries, and justifiably so, then they should not be awarded. *ACLU of Ga. v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999). In other words, fee applicants must exercise "billing judgment" and exclude hours "that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel*." *Id*. (quoting *Norman*, 836 F.2d at 1301 (emphasis in original)). "When a district court finds the number of hours claimed is unreasonably high, the court has two choices: it may conduct an hour-by-

hour analysis or it may reduce the requested hours with an across-the-board cut." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008).

EmCyte seeks to recover fees for 66.1 hours in relation to the motion for sanctions. (Doc. 257 at 8). XLMedica and Stahl counter that EmCyte should be entitled to no more than 17 hours. (Doc. 269 at 13). The court lands somewhere in between. The nineteen-page motion for sanctions and seven-page reply are not complex. A large portion of the papers is dedicated to recounting the facts of the case. And EmCyte's legal argument for sanctions, and Defendants' response, did not raise any difficult or novel issues. Further, some of the time entries provided by EmCyte are vague, include block billing, and appear to include efforts that would have been undertaken regardless of the sanctions motion. Having reviewed the fee motion and its exhibits, the response, and the underlying sanctions motion and related filings, the court finds 28 hours reasonable.[5]

### C.     Expenses

EmCyte's request for $129 associated with legal-research fees (Doc. 257-1 at 7) is reasonable.

---

[5] In the prior sanctions-entitlement order (Doc. 246), the court reserved ruling on whether EmCyte would also be entitled to its fees and expenses associated with the then-contemplated evidentiary hearing for the Rule 26(g)(3) apportionment inquiry. But given the further developed record after that order, an evidentiary hearing on this issue became unnecessary.

## II. Defendants' Motion for Sanctions

In an apparent attempt to divert attention away from their discovery misconduct, Defendants—just before the full-day status conference discussed above—filed a tit-for-tat sanctions motion against EmCyte. (Doc. 245). In a nutshell, the motion argues that EmCyte's post-Ian disclosures about its document-collection-and-production methods were vague and incomplete, and that the disclosures revealed that EmCyte's prior discovery responses were improper. But statements by EmCyte that it would produce any responsive documents to the extent they exist are a far cry from Defendants' affirmative misrepresentations that no responsive documents exist. And during the status conference, Defendants conveyed that no further document production from EmCyte was warranted. Finally, the defendants' disclosures about their own document-collection-and-production methods were no less vague and incomplete. Thus, Defendants' attempt to offset sanctions falls flat.

## III. Defendants' Motion for Protective Order

Defendants XLMedica and Stahl seek protection from four subpoenas directed to three of their banks and a credit-card issuer for their financial records. (Doc. 281). In support, they allude to Stahl's privacy interests, argue that portions of these records are not relevant, and contend that the records would be cumulative of information previously produced to EmCyte.

Generally, parties may "obtain discovery regarding any nonprivileged matter

that is relevant to any party's claim or defense and proportional to the needs of the case. . ..." Fed. R. Civ. P. 26(b)(1). But the court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "The party seeking a protective order has the burden to demonstrate good cause, and must make 'a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements' supporting the need for a protective order." *Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.*, 231 F.R.D. 426, 429-30 (M.D. Fla. Sept. 28, 2005) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)).

As acknowledged by Defendants' cited authorities, relevancy trumps privacy. And the complaint (Doc. 22) and the counterclaim (Doc. 179) put both XLMedica and Stahl's revenues and profits at issue. Thus, their financial records are discoverable. *See Pro Video Instruments, LLC v. Thor Fiber, Inc.*, No. 618-cv1823-ORL-31-LRH, 2019 WL 13067426, *3 (M.D. Fla. Nov. 21, 2019) (compelling a defendant in a trademark-infringement suit to produce financial documents and collecting cases doing the same). Moreover, the parties' confidentiality agreement serves to ameliorate any privacy concerns.

XLMedica and Stahl nevertheless argue that the financial records would be cumulative because they have already provided information about XLMedica's sales. For at least two reasons, this argument fails. First, not just revenues, but

profits, are at issue, and not just those of XLMedica. Further, one must know expenses to arrive at profits. And second, EmCyte is not required to blindly accept the veracity of the sales information provided. So, in sum, the defendants have failed to demonstrate good cause for any protection from the subpoenas.

## IV.  EmCyte's Motion for a Sanctions Hearing

At this point, it is nothing short of shocking that Defendants have not only refused to produce the entire native Quickbooks data set, but that they have resorted to imposing by self-help the very same limits on this discovery that the court squarely rejected during the December 7, 2022 hearing.

During the March 30, 2021 discovery hearing, the court ruled no less than **three** times that Defendants needed to produce the **entire** native file of the their Quickbooks data:

> THE COURT: So I don't know if she's maintaining her books electronically or by paper, but, again, we see a lot of operations like this are using some kind of QuickBooks software or something similar. And, to the extent that that's the case, if it's, like, a QuickBooks type operation, then that – I'll go ahead and let you know the native file needs to be produced on that, whatever software it is.
>
> \*   \*   \*
>
> THE COURT: And, again, I did mention, if there's some kind of software being used to maintain the books of the company, like a QuickBooks type application, I agree with you that native format should be produced.
>
> \*   \*   \*

> THE COURT: And, as I've already said, if the company's books are maintained in something like QuickBooks, that native file needs to be produced ….

(Doc. 110 at 36, 39, 42-43). And contrary to the false narrative recently conjured by the defendants (Doc. 280 at 6-7), this ruling was neither limited to sales data nor limited in any other way. Defense counsel recognized as much during the December 7, 2022 hearing. (Doc. 274 at 136, 139-140, 144 (acknowledging that the court had ordered the production of an "unfettered backup" and arguing for a truncated production going forward)). In fact, while Defendants attempt to recast the court's March 2021 directive as responsive to only two requests for "sales" data, one of the requests they cite requested not just sales data but revenue, cost, and profit data as well. (Doc. 280 at 6).

Defendants also offer the false construct that the March 2021 hearing concerned only six requests for production. That is a wildly inaccurate and misinformed characterization. One need only glance at the motion to compel then at issue (Doc. 73 at 2) to recognize that when the court rejected the suggestion that neither defendant should have to respond to more than 30 requests for production (Doc. 110 at 19, 31, 44), it overruled Defendants' blanket objections to 96 requests directed to XLMedica (Doc. 73-2) and 96 requests directed to Stahl (Doc. 73-3). Moreover, the motion put at issue—and the hearing addressed—the scope of native ESI that should be produced in response to all of the requests for production. (Doc.

73 at 4). And thus, with all the document requests in mind, the court declined to compel the production of native email files, but it required the production of the entire native Quickbooks data file.

And if any doubt lingered, the court put it to rest during the December 2022 hearing. By not only the words expressed, but by the tone of voice, facial expressions, and gestures that accompanied them, it could not have been lost on defense counsel that the court was surprised and frustrated to learn during the December 2022 hearing that the entire native Quickbooks dataset may not have been produced. [6] Even the cold transcript leaves no doubt that the court directed Defendants—once again—to produce the entire native Quickbooks data file:[7]

> THE COURT:  Let me ask you, let me confirm, EmCyte has yet to receive a native QuickBooks file, like, as of today?
>
> PLAINTIFF COUNSEL:  As of today we have no QBB file, Your Honor.
>
> THE COURT: That's the file that an expert would need to open up QuickBooks and see how it's been run –
>
> PLAINTIFF COUNSEL:  That's correct.
>
> \*   \*   \*

---

[6] Further undermining Defendants' arguments, their counsel adamantly claimed at the opening of the December 2022 hearing that the entire native Quickbooks file had been produced. (Doc. 274 at 52 (DEFENSE COUNSEL: "We've produced the Quickbooks file. Prior counsel did, all the data …. The actual [electronic] file from Quickbooks was produced.")). But after a lunchtime recess, they conceded that they could not confirm its production. (Doc. 274 at 134).

[7] As memorialized in the minutes: "Court discussed the defendants' discovery efforts to date and ordered defendants to produce their Quickbooks file in native format within two weeks and at the end of each month thereafter until trial." (Doc. 271).

THE COURT:   I'm familiar that – from other cases that, you know, a native file from QuickBooks has all sorts of audit trail features inside of it.   So if you have a native file, you're going to be able to tell if someone's gone back and changed things ….

*     *     *

DEFENSE COUNSEL:   [W]hat I understand the QBB file to be is an unfettered backup of *the entire QuickBooks*.

THE COURT:   Well, any -- I don't mean to get hung up on the extension, the file extension. Any native file from QuickBooks that an expert could, you know -- pull up their QuickBooks and start seeing -- *seeing everything*[.]

*     *     *

THE COURT:   But obviously what I'm contemplating is, yes, the native file from QuickBooks such that an expert witness can load the file, and it's as if that expert witness is sitting at XLMedica's computer and just opened up the QuickBooks file. It's as if they're right there. I mean, short of this remoting in, they have the data, and *they have everything*.

*     *     *

THE COURT:   Obviously we did order production of the QuickBooks native file some, I don't know, 18 months ago or so. … I don't see any reason why [attorney's-eyes-only] treatment of that QuickBooks information is not sufficient.   So please get that over to the plaintiffs, the current version.   And I want you to continue to send current versions at the end of every month going forward. Again, that needs to be in some format that somebody can load it up live and use it just as if they're sitting at Stahl's or Oliferuk's computer and looking at QuickBooks themselves.   So whether it's QBB or whatever file extension it is, that data needs to be sent over and -- and continually sent over until we get this case resolved.   So does that make sense?

DEFENSE COUNSEL:   Yes.

*     *     *

PLAINTIFF COUNSEL:   So we want the entirety of the QuickBooks.

- 14 -

>THE COURT: Yeah. That's a yes. **Yes. *Native file, the entire thing***, from, I guess, the -- you know -- well, my recollection of how QuickBooks works, I mean, it's going to be from the inception of the file through its current, you know, format.
>
>DEFENSE COUNSEL: I don't think you can parse it.
>
>THE COURT: No. I don't think so.
>
>DEFENSE COUNSEL: I think if you produce it today, *it will have everything* in the past.
>
>THE COURT: *You'll have everything* all the way back to when you first started using it.

(Doc. 274 at 51, 68, 136, 138, 145, 245-246, 247) (emphasis added).

And in the course of adhering to its prior order, the court specifically rejected the defendants' suggestions that something other than the entire native dataset should be produced:

>DEFENSE COUNSEL: Yeah. So my response to their request for the update is that we are willing to have a certified public accountant who has their own ethical obligation to go and verify that the reports that are generated from the updated version are true, correct, and accurate, an independent CPA that can verify that and provide that information but that falls short of giving the QBB file because it doesn't have all the unnecessary, irrelevant data to them. So they get what they --
>
>THE COURT: Well, I'm not going to unwind the order.
>
>\* \* \*
>
>DEFENSE COUNSEL: [M]y response to the updated request is to have a CPA independently verify that those reports are accurate. They could use that through the [Q]BB files. This way it doesn't go into the hands of the other side, and they have the verification that it is accurate.

>THE COURT: No, no. I'm not – I'm not revisiting giving the native QuickBooks data. That's water under the bridge, and any time to have revisited it, I think, is long since passed.

(Doc. 274 at 139-141).

But as if this colloquy with the court never took place, the defendants proceeded to do just that. They filtered the QuickBooks data through an outside accounting firm and produced a truncated file limited to what they deemed to be sales data. (Doc. 279 at 6-7; Doc. 280 at 10). This is entirely improper. Defendants never sought reconsideration or lodged any Rule 72(a) objection to the March 2021 order; nor did they seek any reconsideration or object to the December 2022 order. And the time to do so has long since passed. Instead, they simply disregarded the court's clear and unambiguous directives and essentially revised the court's order on their own. This misconduct is entirely unjustified and warrants sanctions.

But to fashion an appropriate sanction, the court must first determine who is to blame—Defendants or their counsel? If Defendants are culpable, then remedies such as striking all or part of their pleadings may be appropriate—especially since the previous imposition of monetary sanctions did not serve to deter them. Or if fault lies with their counsel, then perhaps monetary sanctions and disciplinary or other remedial measures are warranted. And if Defendants continue to defy the court's orders, contempt proceedings may be necessary. Thus, an evidentiary hearing will be held to ferret this out.

## V. Conclusion

For the reasons discussed during the December 2022 hearing and as set forth above, the court provides as follows:

1. The November 10, 2022 order (Doc. 246) is **VACATED IN PART** such that the evidentiary hearing contemplated therein will not be held because it has become unnecessary. Defendants' motion to stay such evidentiary hearing (Doc. 258) is **DENIED AS MOOT**.

2. Plaintiff's fee-and-expense motion (Doc. 257), as a supplement to its motion for sanctions (Doc. 142), is **GRANTED IN PART**. By **October 27, 2023**, Defendants must file a notice of compliance certifying they have paid **$11,329** to EmCyte. *A failure to fully comply may result in further sanctions including the entry of a default and/or a dismissal of the counterclaims.* Plaintiff's motion for leave to file a reply brief (Doc. 277) is **DENIED AS MOOT**.

3. Defendants' motion for sanctions (Doc. 245) is **DENIED**. Defendants' motion for leave to file a reply brief (Doc. 260) is **DENIED AS MOOT**.

4. Plaintiff's motion for a sanctions hearing (Doc. 279) is **GRANTED**. An in-person evidentiary hearing will be set by separate notice. Defendants must attend in person. XLMedica may appear through Stahl or another corporate designee prepared to testify on its behalf.

5. Defendants' motion for a protective order (Doc. 281) is **DENIED**.

        **ORDERED** on September 29, 2023.

        */s/ Nicholas P. Mizell*
        NICHOLAS P. MIZELL
        UNITED STATES MAGISTRATE JUDGE