IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

EMCYTE CORP.,

      Plaintiff/Counterclaim-Defendant,        Case No. 2:19-cv-769-JES-NPM

v.

XLMEDICA, INC., and ANNA STAHL,

      Defendants/Counterclaimants,

v.

PATRICK PENNIE,

      Counterclaim-Defendant.

_____/

**EMCYTE CORP.'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO QUASH OR MODIFY NON-PARTY SUBPOENAS, OR
FOR A PROTECTIVE ORDER (Doc. 300)**

Over the past four years, Defendants and their counsel stonewalled EmCyte's every effort to conduct meaningful discovery. Regarding discovery of financials, the Court repeatedly ordered production of QuickBooks native files. After Defendants and their attorneys exhausted misrepresentations that they produced the QuickBooks files and squirrely arguments about producing anything other than the QuickBooks files, Defendants resorted to a "shocking" subterfuge. Rather than produce the native QuickBooks backup file as ordered, Defendants quietly enlisted a third-party accounting firm, Briscoe, Doddo and Associates, CPA, P.A. (the "CPAs") to create tampered QuickBooks

files.  Concluding that "[t]his misconduct is entirely unjustified and warrants sanctions," this Court held: "[T]o fashion an appropriate sanction, [an evidentiary hearing must occur to] determine who is to blame—Defendants or their counsel?" (Doc. 246 at 16.)

To keep their behavior in the shadows, Defendants and their attorneys now move (Doc. 300) to quash or modify the subpoenas, or for a protective order.  In support, Defendants and their attorneys argue that the work-product doctrine shades their attorneys' communications with the CPAs about their contemptuous directives to manipulate, tamper with and "fix" the QuickBooks files.  (Doc. 300 at 5–6.)

But the requested communications are not protected work-product.  And Defendants waived any protection that might apply.  Finally, even if the protection is not waived, the communications warrant production under Rule 26.  Accordingly, this Court should deny Defendants' motion.

## BACKGROUND

More than three years ago, EmCyte first requested documents demonstrating Defendants' sales volume, revenue, profit, and costs.  (Docs. 73-4 & 73-5 at 11–12 ¶¶ 31 & 32.)  Defendants refused to produce the documents, and EmCyte moved to compel production on September 18, 2020. (Doc. 73.) The Court considered the motion at a March 30, 2021 discovery hearing.

2

Falsely characterizing XLMedica as "nothing more than a moribund 'one woman shop'" (Doc. 291 at 2), Defendants asserted at the hearing that they would not have "the kind of records" EmCyte sought.  (Doc. 110 at 32:13–21.) Noting that "a lot of operations like [XLMedica] are using some kinds of QuickBooks software," the Court—three times—directed Defendants to produce native QuickBooks or similar files demonstrating XLMedica's financial data.[1]  (*Id.* at 32, 39, 42–43.) The Court even specified that Defendants must produce documents "that can generate, say, quarterly or annual profit and loss, balance sheet, . . . something that [Defendants] would supply to a bank . . . [or] an investor . . . ."  (Doc. 110 at 32:5–9.)

As Defendants now concede, XLMedica maintained, and continues to maintain, financial data in QuickBooks.  For more than a year, however, Defendants refused to comply with the (thrice-given) order to produce the native QuickBooks file.  In the intervening year, EmCyte requested updated QuickBooks files, which the defendants also refused to produce.

---

[1] Specifically, the Court ordered XLMedica to produce documents available to XLMedica "that can generate, say, quarterly or annual profit and loss, balance sheet, that kind of information, something that she would supply to a bank if she were applying for credit or something that she would supply to an investor to get some capital . . . ." (Doc. 110 at 32:5–9.)  Later, the Court stated: "[I]f there's some kind of software's being used to maintain the books of the company, like a QuickBooks type application, . . . that native format should be produced." (*Id.* at 39:16–19).  Finally, the Court reiterated, "[I]f [XLMedica's] books are maintained in something like QuickBooks, that native file needs to be produced." (*Id.* at 42:24–43:1).

73534983;1

The Court considered the Defendants' failure to produce any QuickBooks files at a December 7, 2022 status conference.  At the conference, Defendants first falsely claimed they had produced the QuickBooks, but were incapable of providing any evidence of production.  Ultimately, when cornered with the truth, Defendants' counsel was forced to admit that they were "unable, one way or another, to verify whether it was produced or not."[2]  (Doc. 274 at 134:5–7.) Noting that the dispute about the original QuickBooks file was "water under the bridge," (*Id.* at 54:22–23), the Court told Defendants "if [EmCyte] say[s] [it] doesn't have [the original QuickBooks file], just resend it."  (*Id.* at 56:13–14.)

Further, because Defendants never stipulated to an end-date for damages from the purported tortious interference, the Court stated that the QuickBooks file "would need to be updated periodically."  (*Id.* at 55:1–8) Objecting to periodic production of native QuickBooks files, Defendants' counsel requested to instead provide reports and to have "**an independent CPA** . . . verify [] and **provide that information but that falls short of giving the QBB file** . . . ."  (*Id.* at 139–41 (emphasis added).)

---

[2] Defendants position on whether they ever produced a QuickBooks file prior to the December 7, 2022, hearing has changed at every turn.  Most recently, they rely on a May 5, 2021, email from Defendants' prior counsel to argue that "XLMedica's former counsel <u>did</u> indeed produce a '.qbb' file prior to current counsel taking over the Defendants' representation."  (Doc. 280 at 8 (emphasis in original).)  EmCyte is at a loss to how Defendants reach this conclusion when the very email they quote shows EmCyte responding that "[i]f you do not have a solution, we need you to produce the **underlying native file**." (*Id.* (emphasis added).)

The Court "specifically rejected the defendants' suggestions . . . ." (Doc. 246 at 15–16 (citing Doc. 274 at 139–41).)  Instead, the Court stated: "[W]hat I'm contemplating is, yes, the native file from QuickBooks such that an expert witness can load the file, and it's as if that expert is sitting at XLMedica's computer and just opened up the QuickBooks file.  It's as if they're right there." (*Id.* at 145:1–5.).  At the conference's conclusion, the Court reiterated that Defendants must periodically produce *native* QuickBooks files:

> [THE COURT]: I do want to follow up about—obviously **we did order production of the QuickBooks native file** some, I don't know, 18 months ago or so. And apparently it was—it sounds like it was produced and utilized, so **we need to keep that going.**
>
> I don't see any reason why AEO treatment of that QuickBooks information is not sufficient. So please get that over to the plaintiffs, the current version. And **I want you to continue to send current versions at the end of every month going forward.**
>
> Again, **that needs to be in some format that somebody can load it up live** and use it just as if they're sitting at Stahl's or Oliferuk's computer and looking at QuickBooks themselves.
>
> . . . .
>
> THE COURT: Yeah. That's a yes. Yes. **Native file, the entire thing**, from, I guess, the—you know—well, my recollection of how QuickBooks works, I mean, it's going to be from the inception of the file through its current, you know, format.

(*Id.* at 245:13–246:1 & 247:10–14 (emphasis added).)

5

"But as if this colloquy with the [C]ourt never took place," Defendants promptly proceeded to do exactly what the Court expressly forbid. (Doc. 246 at 16.) Two weeks after the status conference, on December 20, 2022, Defendants' counsel retained the CPAs "to assist" the production. (Doc. 300 at 2; *see* Retention Agreement, attached hereto as **Exhibit 1**.) Three days later, Defendants' produced a purported native QuickBooks file.

When attempting to review the file, however, EmCyte's counsel learned that the credentials permitted access to only a restricted subset of the data. (Doc. 279-1) When EmCyte's counsel inquired about these "non-functional credentials," Defendants' counsel admitted that Defendants retained the CPAs "to assist with the production" and instructed the CPAs to produce a version of the QuickBooks file that permitted EmCyte's counsel to access only "sales data."[3] (Doc. 279-1 at 3.) As Defendants now admit, the CPAs modified the QuickBooks file such that "editing or viewing [non-sales] data would be blocked." (*See* Doc. 296 at 12–13.)

To resolve this contempt, EmCyte requested an evidentiary hearing and an order to show cause. (Doc. 279.) Pursuant to that request, a September 29,

---

[3] Much like their description of XLMedica as a "one-woman operation" and their fluid description of Suzie Lopez's role in this action, Defendants alter the scope of the CPAs' services to suit their interests. Although now describing the CPAs as "non-testifying experts," Defendants have until today relegated the CPAs to merely "assisting production" of the QuickBooks files. Indeed, far from offering expert opinion on litigation issues, Defendants previously asserted to this Court that the CPAs were retained only "to assist with the bates numbering and to assist with applying a username and password to the [QuickBooks] file." (Doc. 280 at 10 n.7.)

6

2023 order (Doc. 291) concludes that Defendants' years-long obstinance constitutes a "contumacious refusal to comply with a crystal-clear directive stated repeatedly by the court" and warrants sanction. (Doc. 291 at 2 & 16.) "But to fashion an appropriate sanction," the Order continues, "the [C]ourt must first determine who is to blame—Defendants or their counsel?" (*Id.* at 16.) The Order concludes that an evidentiary hearing must occur to determine whether Defendants or their counsel instructed the CPAs to manipulate the QuickBooks files. A subsequent Order (Doc. 293) directs the parties to complete fact discovery not later than November 1, 2023.

To aid the Court's determination of the proper party for sanction, to prepare for the forthcoming evidentiary hearing, and to comply with the November 1st discovery deadline, EmCyte promptly served on the CPAs a subpoena to produce documents and a subpoena to appear for a deposition.[4]

In an unsigned response, attached hereto as **Exhibit 3**, the CPAs refuse to produce any communication about the manipulated QuickBooks files, any communication about this action, or any communication about or with Defendants or their counsel. The response claims that "XLMedica and Anna Stahl are asserting work product privilege" over each communication.

---

[4] Specifically, the document subpoena, attached hereto as **Exhibit 2**, was served on October 10, 2023, and directs the CPAs to produce the requested documents not later than October 20, 2023. Also, Because the CPAs were unavailable for a deposition on the requested date, EmCyte and the CPAs are negotiating alternative dates. Defendants have not objected to the deposition.

On October 23, 2023, Defendants moved (Doc. 300) to quash or modify the subpoenas or for a protective order.  Now characterizing the CPAs as "non-testifying expert consultants," Defendants argue that the work-product doctrine, codified in Rule 26(b)(3)(A) and Rule 26(b)(4)(D), Federal Rules of Civil Procedure, protects all communications with the CPAs.

## LEGAL STANDARD

Fed. R. Civ. P. 45 permits a party to subpoena a non-party's deposition or production of discoverable documents. Rule 45 requires a court to quash or modify a subpoena only if, *inter alia*, the subpoena "requires disclosure of privileged or other protected matter" *and* "no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A)(iii).  Also, under Rule 26(c)(1), a "court may, for good cause, issue" a protective order.

In any motion challenging a subpoena under the work-product doctrine, "the party asserting work-product[] bears the burden of showing that [the doctrine protects] the information it seeks to protect."  *L-3 Comms. Corp. v. Sparton Corp.*, Case No. 6:13-cv-1481, 2014 WL 2882925, at *2 (M.D. Fla. June 25, 2014).  "'This is . . . a heavy burden and cannot be discharged by mere conclusory or *ipse dixit* assertions.'"  *Id.* (quoting *In re Initial Public Offering Secs. Lit.*, 249 F.R.D. 457, 459 (S.D.N.Y. 2008)).  Nor is the burden discharged by asserting work-product "'in a blanket fashion.'"  *Id.* (quoting *St. Joe Co. v. Liberty Mut. Ins. Co.*, No. 3:05-cv-1266, 2006 WL 3391208 (M.D. Fla. Nov. 22,

8

2006)).   Instead, the objecting party must demonstrate that each withheld document is protected under either Rule 26(b)(3)(A) or Rule 26(b)(4)(D). *Id.*

Only after the objecting party demonstrates that work-product applies, the burden then shifts to the opposing party to overcome the protection. *Christoff v. Paul Inglese, Northstar Techs. Grp., Inc.*, No. 2:20-CV-546, 2022 WL 17987056, at *3 (M.D. Fla. Nov. 1, 2022).   The opposing party may overcome the protection by demonstrating either waiver or that the information nonetheless warrants disclosure under Rule 26.   *See Id.*; *L-3 Comms. Corp.*, 2014 WL 2882925, at *2–3.

## DISCUSSION

### 1.   Defendants fail to demonstrate work-product protection.

As Defendants note, "the objecting party" must demonstrate that the work-product doctrine prohibits disclosure of the requested information. (Doc. 300 at 8) (citing *Elite Mitigation Servs., LLC v. Westchester Surplus Lines Ins. Co.*, 2020 WL 6127140, at *3 (N.D. Fla. Apr. 6, 2020).)   But in rushing to challenge EmCyte's ability to overcome the protection, Defendants wholly fail to carry this burden.   Because Defendants do not (and cannot) demonstrate that work-product protects the communications, the motion warrants denial.

#### A. Rule 26(b)(4)(D) does not apply to the CPAs

Although baldly asserting that "there is no dispute" that the CPAs were engaged "as [] non-testifying consulting expert[s] with litigation support

73534983;1

services and tasks" (Doc. 300 at 10), Defendants offer no support for the claim that Rule 26(b)(4)(D) applies to the CPAs.

Rule 26(b)(4)(D) protects the "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial." "By its own terms," Rule 26(b)(4)(D) "limits access to a non-testifying expert's knowledge of 'facts' or 'opinions' relevant to the merits of the claims or defenses in the case" and thus protects only consultants who, through their services, obtain "confidential knowledge" concerning a claim or defense. *Gordon v. Kaleida Health*, Case. No. 08-cv-378S(F), 2013 WL 2250506, at *22–23 (W.D.N.Y. May 21, 2013). To fall within Rule 26(b)(4)(D)'s ambit, *Gordon* continues, a consultant retained to assist discovery must obtain, from a "review [of] the documents' content," confidential "facts" or "opinions" about the case. Conversely, *Gordon* concludes, a consultant retained to assist production by "scanning and coding" documents, whose services do not require the consultant to gain any confidential knowledge about the action, is not protected by Rule 26(b)(4)(D). *Id.*

Further, the policy interests underwriting Rule 26(b)(4)(D) demonstrate that the Rule protects only consultants accruing "confidential information" about the action. Rule 26(b)(4)(D) protects:

> (1) an "important interest in allowing counsel to obtain
> the expert advice they need in order properly to
> evaluate and present their clients' position without

> fear that every consultation with an expert may yield grist for the adversary's mill" . . . ; (2) unfairness of allowing an opposing party to benefit from a party's effort and expense incurred in preparing its case; (3) fear of restraint on the willingness of experts to serve as consultants if their testimony could be compelled; and (4) the substantial risk of 'explosive' prejudice stemming from the fact of the prior retention of any expert by the opposing party.

*Caribbean I Owners' Ass'n, Inc. v. Great Am. Ins. Co. of N.Y.*, Case No. 07-cv-829, 2009 WL 499500, at *2 (S.D. Ala. Feb. 20, 2009) (quoting *Pickett v. IBP, Inc.*, Case No. 96-cv-1103, 2000 U.S. Dist. LEXIS 19500 (M.D. Ala. Oct. 16, 2000)) (internal quotations omitted).  In other words, Rule 26(b)(4)(D) protects against fears that discovery of a non-testifying expert's knowledge might reveal confidential information about a party's "position" and at far lower expense, that an expert's opinion might be "explosively prejudicial" if the opinion undermines the party who originally retained the expert, and that these two concerns might chill consultation of non-testifying experts.  In sum, these policy interests rest on the consultant collecting confidential information about the action that might injure the retaining party—not on the consultant's retention to support the litigation in any form.

Here, Defendants previously asserted to this Court that the CPAs were retained only "to assist with the bates numbering and to assist with applying a username and password to the [QuickBooks] file."  (Doc. 280 at 10 n.7.)  Although now calling the CPAs "expert consultants," Defendants offer no other

11

description of the CPAs' services.  The CPAs (1) collected no facts about, (2) conducted no analysis of, and (3) offered no opinion on, any part of this action.

Like in *Gordon*, the CPAs were retained solely to assist the production of discoverable documents. The CPAs only ever reviewed documents that—as Defendants now concede—should have been produced in full.  The CPAs' services never caused them to gain "confidential knowledge" about a claim or defense in this action.

Moreover, no policy underwriting Rule 26(b)(4)(D) supports protecting the CPAs.  The CPAs were not retained "to [help] evaluate and present [Defendants'] position," EmCyte would not "unfair[ly]" benefit from learning about the CPAs' clerical services, disclosure of the clerical services would not chill non-testifying experts, and disclosure of the services will not risk explosive prejudice at trial.  *See Caribbean 1 Owners' Ass'n, Inc.*, 2009 WL 499500, at *2.  Because they satisfy neither the letter nor the policy of the Rule, the CPAs are not experts protected by Rule 26(b)(4)(D).

## B. Defendants fail to demonstrate that the communications are otherwise protected.

Although stating in conclusory fashion that "all materials exchanged with [the CPAs] are properly withheld under Rule 26(b)(3)(A)" (Doc. 300 at 10), Defendants make no effort demonstrate that these communications with non-

experts warrant protection under the Rule.  Moreover, the context of the communications demonstrates that they are not protected by Rule 26(b)(3)(A).

Rule 26(b)(3)(A) states that "ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by another party or its representative . . . ." As *L-3 Communications Corp.* notes, a party invoking Rule 26(b)(3)(A) must specifically raise and demonstrate that each withheld document constitutes a document or thing prepared in anticipation of litigation or for trial. 2014 WL 2882925, at *2 (noting that the privilege may not be "asserted in a blanket fashion").  That is, the objecting party must file a privilege log describing the withheld documents so that "the other party may assess the claim of privilege." *Desoto Health & Rehab, L.L.C. v. Phila. Indem. Ins. Co.*, Case No. 2:09-cv-599, 2010 WL 4853891, at *2 (M.D. Fla. Nov. 22, 2010).

Further, the work-product doctrine "does not protect factual *information* from disclosure. Rather, it protects a party only from disclosing particular documents containing the information." *Stern v. O'Quinn*, 253 F.R.D. 663, 687 (S.D. Fla. 2008) (emphasis in original).

Here, neither Defendants nor the CPAs attempt to demonstrate that work-product protects a withheld document or even to describe what documents are withheld.  Indeed, neither party has complied with even the minimum requirement of producing a privilege log.  Further, neither party can

demonstrate that work-product protects these communications. The CPAs were retained to assist production of the QuickBooks Files—a production that should have occurred in full.  Any "document or tangible thing" conceivably created by the CPAs was explicitly created for disclosure.  And EmCyte seeks only the *facts* regarding the CPAs' directive to manipulate the QuickBooks files.  Because Defendants do not (and cannot) explain how work-product protects the facts conveyed to the CPAs, the motion warrants denial.

## 2.    Defendants waived any work-product protection.

Even if work-product otherwise applies, Defendants' communications with the CPAs are discoverable because Defendants waived any protection. *See L-3 Comms. Corp.*, 2014 WL 2882925, at *3 (noting that a court may resolve a discovery dispute "on the basis of waiver, without the Court having to decide if [the objecting party] sustained its burden, and without the Court having to resolve any disputed issues of fact.").  A party waives work-product protection either explicitly, by disclosing the protected document to the opposing party, or implicitly, by putting the information at-issue or by selectively invoking the information.  *See, e.g.*, *Stern v. O'Quinn*, 253 F.R.D. 663, 676–80 (S.D. Fla. 2008).[5]

---

[5] According to *Devault v. Isdale*, Case No. 6:15-cv-135, 2016 WL 25956, at *4 (M.D. Fla. Jan. 4, 2016), implied waiver extends only "to fact, as opposed to opinion work product." Because EmCyte seeks no opinions from the CPAs, only the fact of who instructed them to manipulate the QuickBooks file and what the CPAs were instructed to do, this distinction is inapposite here.

73534983;1

At her recent deposition (as corporate representative of XLMedica), Anna Stahl testified at length about Defendants' purported communications with the CPAs.  (*See* Stahl Dep., excerpts of which are attached hereto as **Exhibit 4**,[6] at 231–45.)[7] Further, at the deposition, Defendants' counsel stated that they would "allow [Stahl] to explain her communications and instructions with her attorneys regarding [the communications]." (*Id.* at 30:1–15.)

By "purposefully disclosing the sum and substance" of the communications with the CPAs, Defendants affirmatively waive any work-product protection.  *Ahern v. Pac. Gulf Marine, Inc.*, Case No. 8:06-cv-2068, 2007 WL 9723901, at *3 (M.D. Fla. Nov. 8, 2007).  Further, by putting the communications at issue and by selectively invoking the communications to support their position, Defendants impliedly waived any work-product protection. Thus, the communications with the CPAs warrant production.

## A. Defendants put the communications at-issue.

By their own misconduct, Defendants affirmatively placed the communications with the CPAs at-issue and thus waived work-product protection.  As *Devault v. Isdale*, Case No. 6:15-cv-135, 2016 WL 25956 (M.D. Fla. Jan. 4, 2016), notes, "'[A] party waives work-product or privilege protection

---

[6] Other portions of the deposition were designated "Attorneys' Eyes' Only."  EmCyte will produce a complete copy of the verified transcript under seal when available and at the Court's request.

[7] Stahl testified that she "do[esn't] know QuickBooks," "d[idn't] know" why the CPAs were retained, and "d[idn't] know" whether the CPAs created a new QuickBooks file. According to Stahl, she (or, A2M Bio, Inc.) sent the native file to counsel who "took it from there." (*Id.* at 231:6–17, 244:3–9.)

when (1) assertion of the protection results from some affirmative act by the party invoking the protection; (2) through this affirmative act, the asserting party puts the protected information at issue by making it relevant to the case; and (3) application of the protection would deny the opposing party access to information vital to its [claim or] defense."' *Devault*, 2016 WL 25956, at *4 (quoting *Stern v. O'Quinn*, 253 F.R.D. 663, 676 (S.D. Fla. 2008)).

Here, Defendants put at-issue precisely the information they seek to protect—the source and content of the directive that the CPAs manipulate the QuickBooks files. But for the "affirmative act of [Defendants]"—the refusal to comply with a crystal clear order—no party would require or seek these communications. "[T]hrough this affirmative act," the context of the directive to the CPAs is now distinctly relevant. Specifically, this context is necessary both to determine the proper recipient(s) of any sanction and to determine a proper sanction.[8] Finally, because facts about the communications exist only in the control of Defendants or the CPAs, permitting Defendants to invoke work-product "would deny [EmCyte] access to information vital to its claim," namely, that Defendants willfully violated the Court's order.

---

[8] For example, as Defendants note in their motion for reconsideration, some sanctions, including striking pleadings, "can only be imposed based on a finding" of willfulness or bad faith. (Doc. 296 at 5.) Any assessment of willfulness or bad faith will benefit from, if not require, facts pertaining to (1) who told the CPAs to manipulate the QuickBooks files, (2) what purpose might have been conveyed to the CPAs, and (3) what exactly the CPAs were told to do.

73534983;1

**B. Defendants affirmatively invoke the communications.**

By resting their defense to contempt on the communications with the CPAs, but objecting to disclosure of any such communications, Defendants attempt to use work-product as both a sword and shield and impliedly waive the protection. *See Ahern*, 2007 WL 9723901, at *3.

"[O]ne cannot simultaneously invoke the work product privilege while making affirmative use of the materials it wishes to protect from disclosure." *Id.*; *see GAB Business Servs., Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir. 1987) (applying sword-and-shield waiver to a claim of attorney-client privilege). As *Ahern* notes, a party may not "affirmatively rely[] upon aspects of privileged documents to support their claim and then shield the underlying information from scrutiny by the opposing party." *Id.* A party defending their case with specific documents or information implicitly waives any objection to the subsequent production of the same documents or information. *Id.*

In their objection (Doc. 296) and motion for reconsideration (Doc. 297), Defendants reference and describe their discussions with the CPAs. (*E.g.*, Doc. 296 at 12 ("XLMedica sent the consultant the database backup and with the consultant's assistance, user credentials were created for EmCyte . . . ."); Doc. 297 at 12 (same); Doc. 296 at 10 ("Counsel needed to confer with technical litigation support to confirm" whether Defendants could produce a "native" QuickBooks file that restricted access to the "native" data).) Also, as discussed,

17

Anna Stahl in her recent deposition invoked her communications with the CPAs (or lack thereof).  (Ex. 4, Stahl Dep. at 231–45.)

Defendants use these selective invocations to cast doubt on the source of the directive to manipulate the QuickBooks file and to bolster the argument that any violation of the Court's order resulted from a good faith misunderstanding.  (*See* Doc. 296 at 11)  Having "purposefully, and arguably strategically," invoked the communications, Defendants cannot now prohibit EmCyte or this Court from testing Defendants' claims.  *Ahern* 2007 WL 9723901, at *4. By placing the communications at-issue and by tactically invoking the communications, Defendants waived any work-product protection of the communications.  Thus, the motion warrants denial.

### 3.   The communications warrant disclosure under Rule 26.

Even if work-product protects the communications with the CPAs, and even if Defendants have not waived such protection, the communications nonetheless warrant disclosure under Rule 26(b)(3)(A) or Rule 26(b)(4)(D). Rule 26(b)(3)(A) permits disclosure if the party "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Rule 26(b)(4)(D) permits disclosure "on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means."

73534983;1

The communications warrant production under either standard.  Under Rule 26(b)(3)(A), EmCyte has a substantial need for the communications because the communications are necessary to determine "who is to blame" for violating the Court's order—"Defendants or their counsel?"  Further, because the communications are known only to the CPAs and Defendants (or their counsel), EmCyte plainly cannot obtain this information except by obtaining the communications or testimony about the communications.

Similarly, under Rule 26(b)(4)(D), the facts of this dispute constitute "exceptional circumstances" justifying production. Again, the communications themselves are central to determining "who is to blame." Without understanding who told the CPAs to manipulate the QuickBooks files and how they were told to manipulate the files, this Court cannot craft an appropriate sanction.  And because the communications themselves are at-issue, EmCyte cannot "obtain facts or opinions about" the communications by other means. Thus, under Rule 26(b)(3)(A) or Rule 26(b)(4)(D), the communications warrant production, and the motion to quash or modify the subpoena warrants denial.

## 4.   No protective order should issue.

Finally, because the communications are not privileged, are relevant, and indeed are central to a determination of "who is to blame" for the violation of the Court's order, no protective order should issue.  A protective order may issue "for good cause" only.  Fed. R. Civ. P. 26(c).  Other than the deficient

73534983;1

claim of work-product protection, Defendants identify no "good cause" justifying a protective order.  Because the communications are not protected, Defendants demonstrate no good cause and no protective order should issue.

## CONCLUSION

Defendants' motion rests on the central conceit that this Court's September 29, 2023 Order never issued.  Defendants pretend that EmCyte is engaged in a "fishing expedition" to collect information that it could obtain by "view[ing] and compar[ing] the [QuickBooks] files."  (Doc. 300 at 12.)  In fact, EmCyte seeks the context surrounding the directive—from Defendants or their counsel—that the CPAs manipulated the QuickBooks files in violation of this Court's express order.  This context is among the most important evidence demonstrating "who is to blame" for the violation.  (Doc. 246 at 16.)

Because Defendants fail to demonstrate that any protection applies, because Defendants waived any protection that might apply, and because Rule 26 permits disclosure, this Court should deny Defendants Motion and should permit EmCyte to collect this necessary evidence.  Finally, if the Court denies the motion, EmCyte respectfully requests, pursuant to Fed. R. Civ. P. 37(a)(5)(C), that the Court award EmCyte the reasonable expenses incurred to oppose this motion or permit EmCyte to move for the reasonable expenses.

[SIGNATURE PAGE FOLLOWS]

73534983;1

Dated:  November 6, 2023.          Respectfully submitted,

*/s/ Alejandro J. Fernandez*
Alejandro J. Fernandez, Trial Counsel
FL. Bar No. 32221
Email:alejandro.fernandez@akerman.com
Neema Monfared
FL. Bar No. 1035991
Email: neema.monfared@akerman.com
Kateryna Karpenko, *admitted pro hac vice*
Email: kate.karpenko@akerman.com
Keenan Molaskey
Fl. Bar No. 1031827
Email: keenan.molaskey@akerman.com
**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602
Telephone No.: (813) 209-5055
Facsimile No.: (813) 218-5413

Kenneth G.M. Mather, Trial Counsel
FL. Bar No. 619647
Email: kmather@gunster.com
**Gunster, Yoakley & Stewart, P.A.**
401 E. Jackson Street, Suite 2500
Tampa, FL 33602
Telephone No.: (813) 222-6630
Facsimile No.: (813) 228-6739

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, a true and correct copy of the foregoing was filed electronically and was served via the CM/ECF electronic filing system which will send notification of such filing to designated counsel through the Court's electronic filing system.

*/s/ Alejandro J. Fernandez*
Alejandro J. Fernandez

21

73534983;1