# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

EMCYTE CORPORATION,

     Plaintiff,

v.                                                                    2:19-cv-769-JES-NPM

XLMEDICA, INC., and ANNA STAHL,

     Defendants / Counterclaimants,

v.

EMCYTE CORPORATION and PATRICK PENNIE,

     Counterclaim Defendants.

_____

## DISCOVERY ORDER

This lawsuit arises from a dispute over trademark rights concerning plaintiff EmCyte's blood-concentrating systems PURE PRP® SupraPhysiologic (PURE PRP) and PURE BMC™ SupraPhysiologic (PURE BMC). EmCyte alleges that defendants Anna Stahl (a former employee of EmCyte) and her company, XLMedica, engaged in trademark infringement. In countersuit, defendants allege that EmCyte and its chief executive officer, Patrick Pennie, engaged in tortious interference. This action has been ongoing for over four years; unduly delayed and complicated by the fact that the defendants are now on their third set of lawyers.

A years-long course of discovery motions and discovery hearings culminated

in the court's entry of a September 2023 sanctions order. (Doc. 291). Among other things, the court found EmCyte entitled to $11,329 in fees and expenses for the defendants' "improper document-production practices." (*Id.* at 5). And the court granted EmCyte's motion for an evidentiary hearing to determine whether the defendants or their counsel should be sanctioned for producing a limited-access version of a QuickBooks file despite multiple orders directing them to produce a full-access version of the file. (*Id.* at 11-17).

Defendants request that we reconsider the September 2023 sanctions order, but only to the extent it found the improper production of the QuickBooks file to be sanctionable and contemplated further proceedings to tailor an appropriate sanction. (Doc. 296). Also pending before the court is the defendants' motion for protection from EmCyte's non-party subpoenas concerning the production of the limited-access version of the QuickBooks file (Doc. 300), and EmCyte's motion to sanction the defendants for the alleged spoliation of electronically stored information (Doc. 285).

## I.    Defendants' Motion for Partial Reconsideration

"A motion for reconsideration does not provide an opportunity to simply reargue—or argue for the first time—an issue the Court has already determined. Court opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Grey Oaks Cty. Club, Inc. v. Zurich Am. Ins.*

*Co.*, No. 2:18-cv-639-FtM-99NPM, 2019 WL 4594591, *2 (M.D. Fla. Sep. 23, 2019) (citation omitted). Indeed, courts have delineated only three major grounds justifying reconsideration: "(1) an intervening change in controlling law; (2) the availability of new evidence; (3) the need to correct clear error or prevent manifest injustice." *Pritchard v. Fla. High Sch. Ath. Ass'n*, No. 2:19-cv-94-FtM-29MRM, 2020 WL 3414988, *1 (M.D. Fla. June 22, 2020) (quoting *Sussman v. Salem, Saxon & Nielsen, P.A.*, 153 F.R.D. 689, 694 (M.D. Fla. 1994)). And the motion must set forth facts or law of a strongly convincing nature to demonstrate to the court the reason to reverse its prior decision. *Taylor Woodrow Constr. Corp. v. Sarasota/Manatee Airport Auth.*, 814 F. Supp. 1072, 1073 (M.D. Fla. 1993). In short, "[a] motion for reconsideration should raise new issues, not merely readdress issues litigated previously." *Painewebber Income Props. Three Ltd. P'ship by & Through Third Income Props. v. Mobil Oil Corp.*, 902 F. Supp. 1514, 1521 (M.D. Fla. 1995).

But that is what the defendants do here. With respect to the impropriety of their producing a limited-access, and not a full-access, QuickBooks file, they simply repeat the same points that were flatly rejected in the September 2023 sanctions order. And worse yet, they pretend as if pages of that order do not exist. Both then and now, the defendants' attempt to explain away their misconduct is built around the notion that, during a March 2021 discovery hearing, the court ordered the production of only a limited subset of the QuickBooks data. But from pages eleven

to thirteen of the September 2023 order, the court explained how this was not so, and why the court, in fact, ordered the defendants to make the entire QuickBooks file available to EmCyte. (Doc. 291 at 11-13). Tellingly, the motion to reconsider takes no issue with this portion of the September 2023 order, and this is fatal.

Nails in the coffin: defense counsel's acknowledgments during the December 2022 hearing. As discussed in the September 2023 order, defense counsel repeatedly acknowledged during the December hearing that the court had previously ordered— in March 2021—the production of a full-access version of the QuickBooks file. (Doc. 291 at 12). And as also discussed in the September 2023 order, the December 2022 hearing ***ended*** with defense counsel acknowledging that the court had, once more, ordered the defendants to make the entire QuickBooks file available to EmCyte. (Doc. 291 at 15). But again, the motion to reconsider pretends that none of this happened—neither defense counsel's acknowledgments during the December 2022 hearing that the defendants were ordered, both then and in March 2021, to give EmCyte full access to the QuickBooks file, nor the court recounting as much in its September 2023 sanctions order. The motion shamelessly shrugs off any duty of candor.

To recap, the court clearly directed the defendants to make the entire native QuickBooks dataset available to EmCyte in March 2021, and again in December 2022, and the court categorically rejected defense counsel's suggestion that—on a

going forward basis—an outside accounting firm could create a limited-access version so as to limit the production to that which the defendants deemed relevant. Notwithstanding, the defendants continue to offer their arguments to the contrary, and in essence, ask the court to "rethink what it already thought through—right or wrongly," which is an improper use of a motion to reconsider. *In re Kuhl*, No. 21-cv-60408-Bloom/Valle, 2022 WL 13637716, *3 (S.D. Fla. Oct. 21, 2022) ("when there is mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted").

Furthermore, the court finds the defendants' remaining argument for reconsideration—that "it was clearly erroneous and legally improper for the Magistrate Judge to enter a sanctions finding in connection with the QuickBooks production issue when the Court had not previously entered a clear order compelling the expanded production"—to be without merit. A finding is clearly erroneous only "when a review of the entire record leaves us with the definite and firm conviction that a mistake has been committed." *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1357 (11th Cir. 2020) (internal quotation marks omitted). Or as the Seventh Circuit has put it: "[t]o be clearly erroneous, a decision must strike [the court] as more than just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week old, unrefrigerated dead fish." *Parts & Elec. Motors v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988).

But no such mistake was made here, and sanctions are appropriate because the defendants knowingly defied the court's orders when they produced a limited-access QuickBooks file after the court explicitly rejected this notion. *See Douse v. Delta Air Lines Inc.*, No. 21-13499, 2023 WL 6636194, \*5 (11th Cir. Oct. 12, 2023) (Under Rule 37, sanctions may be imposed if a party "fails . . . to provide or permit discovery."); *see also Dover Shores Shell, Inc. v. Scottsdale Ins. Co.*, No. 6:22-cv-167-PGB-DCI, 2023 WL 3994928, \*2 (M.D. Fla. June 14, 2023) ("Bad faith exists . . . where a party or attorney knowingly or recklessly . . . hampers the enforcement of a court order.").

While the defendants place great emphasis on their view that the court never entered a ***written*** order "compelling a broad scope of production" (Doc. 296 at 4), "Rule 37, on its face, does not require that a court formally issue an order compelling discovery before sanctions are authorized." *Consumer Fin. Prot. Bureau v. Brown*, 69 F.4th 1321, 1330 (11th Cir. 2023). Rather, "an oral discovery order is a valid basis for Rule 37 sanctions." *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 n.7 (11th Cir. 1993). And nonetheless, the court issued a written order on March 31, 2021, stating: "By April 29, 2021, Defendants will fully respond to the discovery requests as directed during the [March 30, 2021] hearing[,]" which included the unqualified directive to make the native QuickBooks file available to EmCyte. (Doc. 107 at 2). At bottom, the court is not convinced that the imposition

-6-

of sanctions is clearly erroneous. *Cox Enters., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1272 (11th Cir. 2015) ("[T]he 'clear error' exception must be rarely invoked.").

However, to the extent the defendants request reconsideration of the contemplated use of an evidentiary hearing to tailor an appropriate sanction (Doc. 296 at 6), there is now a further developed record that makes it appropriate for the court to do so. *See Taylor Woodrow*, 814 F. Supp. At 1073 ("When issues have been carefully considered and decisions rendered, the only reason which should commend reconsideration of that decision is a change in the factual or legal underpinning upon which the decision was based.").

In the September 2023 sanctions order, the court contemplated that defendant Stahl would appear and testify on behalf of herself and her company about whether the production of the limited-access QuickBooks file was more her doing or her counsel's:

> … to fashion an appropriate sanction, the court must first determine who is to blame—Defendants or their counsel? If Defendants are culpable, then remedies such as striking all or part of their pleadings may be appropriate—especially since the previous imposition of monetary sanctions did not serve to deter them. Or if fault lies with their counsel, then perhaps monetary sanctions and disciplinary or other remedial measures are warranted. And if Defendants continue to defy the court's orders, contempt proceedings may be necessary. Thus, an evidentiary hearing will be held to ferret this out.

(Doc. 291 at 16). But since then, Stahl appeared for a deposition about this issue, and her testimony shows that her counsel were the driving force behind the creation

-7-

and production of the limited-access QuickBooks file. Some excerpts:

> DEFENSE COUNSEL: Because there are some motions pending before the court that haven't been decided that relate to the production of the QuickBooks documents, and we know that you're going to ask some questions and there's some information that we think the court's going to want and you're going to want related to that, we're agreeing to allow the witness to explain her communications and instructions with her attorneys regarding whose decision it was how to produce the QuickBooks file and in what fashion ….

> PLAINTIFF COUNSEL: Can you walk us through how your QuickBooks files ended up at a CPA's—Briscoe Doddo.

> ANNA STAHL: So **we got the directive from my lawyer** to send a native file to them, and then our lawyers took it from there.

> \*        \*        \*

> PLAINTIFF COUNSEL: Why did you engage a CPA?

> ANNA STAHL: It was -- oh, why did we engage CPA? **It was our lawyer who suggested it**, and we trusted the [sic] judgment.

> \*        \*        \*

> PLAINTIFF COUNSEL: Was it your idea to engage a CPA?

> ANNA STAHL: Not that I can recall.

> \*        \*        \*

> PLAINTIFF COUNSEL: Okay. Did you approve of the engagement of the CPA?

> ANNA STAHL: **On advice of my counsel**, I trust her judgment.

> \*        \*        \*

> PLAINTIFF COUNSEL: Were your attorneys allowed by you to hire a CPA?

> ANNA STAHL: Again, I trusted the judgment of **my attorneys**, and if they **said it was necessary to have a CPA** to -- to comply with the court order.

\*       \*       \*

PLAINTIFF COUNSEL: So you were aware that your attorneys were hiring a CPA?

ANNA STAHL: **I was aware that they were working with a CPA, but I didn't know any specific communications between them**.

\*       \*       \*

PLAINTIFF COUNSEL: Do you -- were you aware that the CPA firm limited access to the QuickBooks file?

ANNA STAHL: Again, the conversations were between the attorneys and CPA. I didn't have any communications with them personally.

\*       \*       \*

PLAINTIFF COUNSEL: **Did you approve the file that was created by the CPA firm** to be produced to EmCyte?

ANNA STAHL: **I trusted my attorneys so they could use their expertise and judgment**.

(Doc. 303-4 at 6, 11-12, 14, 16, 18-20) (emphasis added).

In sum, this blunder appears to have had its genesis in the December 2022 hearing, during which it first occurred to defense counsel that they should try to have a CPA firm generate QuickBooks reports that would "fall short" of giving EmCyte the QuickBooks file. (Doc. 274 at 140). Thus, defense counsel—and not the defendants—are responsible for flouting the court's orders and must be sanctioned.

Pursuant to Rule 37, and to both sanction and deter the conduct that transpired

-9-

here, defense counsel shall pay $1,600[1] to EmCyte as an expense-of-motion award, and they shall certify the completion of the professionalism programs and related tasks set forth at the end of this order. *TASER Int'l, Inc. v. Phazzer Elecs., Inc.*, No: 6:16-cv-366-PGB-LHP, 2024 WL 112596, *1 (M.D. Fla. Jan. 10, 2024) ("Rule 37 allows district court judges broad discretion to fashion appropriate sanctions for the violation of discovery orders.").

## II.   Defendants' Motion for Protection from Nonparty Subpoenas

Defendants seek relief from EmCyte's nonparty subpoenas for testimony and documents from the CPA firm that defense counsel hired to create the limited-access QuickBooks file. (Doc. 300). EmCyte argues this information would help the court determine "who is to blame" for the QuickBooks debacle. (Doc. 303 at 7, 19). Notably, the CPA firm has testified through a corporate representative as to some of the issues identified in the subpoenas, and it has produced some of the requested documents, such as its engagement letter, invoices, and all QuickBooks files that it received and generated for this action. (Doc. 304 at 2-3).

An entire course of discovery about this discovery-order violation is

---

[1] Informed by its expertise about reasonable amounts of time for litigation tasks, the court concludes that four hours would have been a reasonable amount of time for EmCyte's counsel to confer with their client and opposing counsel about the defendants' post-December 2022 failure to comply with the court's orders, seek resolution without court intervention, assess potential remedies, and request remedial action from the court—either by telephone or motion (on the heels of a full day hearing, a call to chambers may have sufficed). And as for an hourly rate, the court continues to use $400 per hour, which it found reasonable when previously granting EmCyte an expense-of-motion award for a discovery issue. (Doc. 291 at 7).

unwarranted, and the testimony of Stahl and the other submissions of the parties to date are more than enough to resolve the issue. An evidentiary hearing is no longer necessary; nor are the subpoenas.

## III.   EmCyte's Motion for Spoliation Sanctions

One final discovery issue remains—whether defendants should be sanctioned pursuant to Rule 37(e) for allegedly engaging in the spoliation of electronically stored information ("ESI").[2] EmCyte conducted nonparty discovery that yielded ESI originally generated by key figures associated with XLMedica—Kimberly West and Susie Lopez.[3] And EmCyte reports this ESI was never produced by XLMedica even

---

[2] "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (internal citation omitted). Federal Rule of Civil Procedure 37(e) provides the legal framework for spoliation of ESI, *see ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018), stating:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

[3] Kimberly West worked as a "Clinical Director" for XLMedica (Doc. 285-1 at 24), while Suzie

though it was responsive to EmCyte's discovery requests. (Doc. 285 at 1-2). From this, EmCyte believes other responsive ESI may have been lost due to possible failures to implement adequate litigation holds or properly supervise the collection and production of ESI. (Doc. 285 at 1). On these grounds, EmCyte requests a finding that the defendants engaged in spoliation, and an order requiring a forensic examination of their devices to potentially identify the loss of responsive ESI. (Doc. 285 at 1-2). Defendants respond by contending that this motion is just another example of EmCyte generating discovery disputes to obtain leverage rather than litigating this case on its merits. (Doc. 299. at 3 n.3).

Although the court assumes general familiarity with the history of this case, a brief summary of prior related events provides context. Over two years ago, EmCyte moved for sanctions "[t]o put an immediate and permanent stop to Defendants' [discovery] dodgery," requesting in part that the court order "an immediate hand-over of a forensic copy of the laptop used by Defendants to warehouse Defendants' documents to EmCyte's counsel for inspection, together with access to cloud-based, text and email systems where the remaining documents are maintained" as well as monetary sanctions. (Doc. 142 at 3). In the meantime, the parties also filed motions to compel—each alleging that the other party was not providing relevant discovery,

Lopez was intermittently engaged as an independent contractor to serve as the defendants' "Clinical Specialist/Executive Assistant." (*Id.* at 3).

including ESI.[4] (Docs. 167, 213). The court granted in part the parties' motions to

compel, directing them to:

> exchange written descriptions of the search protocols employed to identify,
> collect, and produce documents responsive to document requests. These
> descriptions must identify with particularity the paper and electronic
> repositories searched and the custodians of same, any search terms or search
> strings used for searching voluminous files, the dates when searches were
> conducted, and who conducted each search.

(Doc. 237 at 2-3). The court also granted in part EmCyte's motion for sanctions (*Id.*

at 1) but held off on determining the precise contours of relief until it received certain

exhibits which included a collection of documents produced by non-party

Kelly J. Parsons Creative Services, LLC ("KPCS"). Upon receipt of the exhibits, the

court found that:

> [D]efendants failed to adopt a reasonable plan to identify, collect, and
> produce documents responsive to requests for production and "purposefully
> implement[] that plan in good faith." M. D. Discovery Handbook, Section
> III.A.4. Defendants have represented they have no responsive documents to
> certain requests, but the KPCS production rebuts this claim. In fact, the
> KPCS production confirms that Susie Lopez—a key figure within XLMedica
> whose portfolio includes XLMedica's marketing and sales (Doc. 142-10 at
> 23, 26)—would likely have responsive documents in her paper and electronic
> files. Yet, even after EmCyte used some KPCS documents in support of its
> discovery motion, the defendants chose not to revisit their deliberate choice
> to omit Lopez's files from their search for responsive documents.

(Doc. 246 at 2-3). The court advised the defendants that they would need to attend

an evidentiary hearing on December 7, 2022, to answer questions about their effort

---

[4] Defendants alleged that **EmCyte had "not produced a single email communication** in the 2018
to present timeframe." (Doc. 167 at 3) (emphasis added). Likewise, EmCyte alleged that the
defendants had "stipulated to conducting ESI searches, but then refused to complete the searches
and withheld responsive documents." (Doc. 213 at 2 n.1).

to identify, collect, and produce responsive documents. Finally, the court found that EmCyte was entitled to an award of its reasonable expenses, including attorney's fees, for its motion for sanctions but declined to order a forensic examination. (*Id.* at 3-4).

In due course, the parties provided notices of compliance with the court's order compelling discovery which included descriptions of their ESI search protocols and phrases. (Docs. 243, 243-1, 249, 249-1-249-3, 250, 250-1). The court proceeded to meet with counsel on December 7, 2022,[5] during which the issue of ESI came up again but primarily about *text messages*. (Doc. 274 at 70, 218-221). While it became abundantly clear that ***neither*** party had produced *text messages* nor had they devised any protocol for doing so, EmCyte zeroed-in on Susie Lopez's testimony—that she never received instructions to preserve ESI and she deleted text messages—and suggested that sanctions may be appropriate given the defendants' overall failure to preserve ESI. (*Id.* at 219, 221, 224-25). As an alternative, the court proposed that the defendants "double-check" to see if there was a way to obtain such information from Lopez's phone or computer. (*Id.* at 220). EmCyte believes that the defendants did not heed the court's suggestion. (Doc. 285 at 3). Rather than engage

---

[5] Purported conflicts were presented about the defendants' availability for the evidentiary hearing initially scheduled on this day. (Doc. 258). Thus, the court instead conducted a full-day status conference with the parties' counsel to narrow the issues in dispute and steer their discovery efforts to a conclusion. (Docs. 262, 263, 271).

in a good-faith conferral with opposing counsel to resolve this issue, as required by 3.01(g),[6] EmCyte filed the instant motion for sanctions. (Doc. 285).

However, the court is not convinced that any additional sanctions or remedial measures are necessary. To begin, EmCyte points to Stahl's purportedly unsupervised and self-guided efforts to collect responsive documents; the search of West's repositories that did not begin until January 2022; the search of Lopez's repositories that did not occur until late 2022; the defendants' allegedly belated enlistment of a firm to collect ESI; and the court-imposed sanctions on the defendants for other discovery misconduct, to justify another round of sanctions. (Doc. 285 at 2-3). But the court already considered these issues when it previously issued monetary sanctions and declined to approve EmCyte's request for a forensic

---

[6] Apparently, EmCyte brought this issue to the court after its counsel sent multiple emails to defense counsel beginning on March 24, 2024. (Doc. 286-1). But as stated in the Case Management and Scheduling Order: "The term 'confer' in Rule 3.01(g) requires a substantive conversation *in person or by telephone* in a good faith effort to resolve the motion without court action, and does not envision an exchange of ultimatums by fax or letter." (Doc. 29 at 3) (emphasis added). But that is exactly what EmCyte did when it proposed to the defendants that—in order to avoid a spoliation motion—they had to terminate their motion for sanctions against EmCyte, agree to an immediate forensic examination, or consent to a default judgment. (Doc. 286-1 at 4-5). While it appears that defense counsel tried to determine what ESI, if any, EmCyte believed was missing, and that they were willing to review relevant repositories, EmCyte's counsel simply alleged there were "gaps" in the defendants' production of ESI, and that the defendants' effort to shift the burden to EmCyte was improper. (*Id.* at 2-3). Thus, EmCyte's motion complies with neither Local Rule 3.01(g) nor the CMSO. And to the extent EmCyte's counsel may have conferred with opposing counsel after filing the motion, they failed to comply with Local Rule 3.01(g)(3) (requiring a supplemental certification about the outcome of the conference). This, alone, warrants the denial of EmCyte's spoliation motion.

examination of the defendants' laptop(s). (Docs. 142, 237, 246).

Furthermore, EmCyte relies upon its recovery of just *thirteen* emails to request that this court infer the existence of lost ESI. However, "[p]erfection in preserving all relevant electronically stored information is often impossible." *Incardone v. Royal Carribean Cruises, Ltd.*, No. 16-20924-cv-MARTINEZ/GOODMAN, 2019 WL 3779194, *19 (S.D. Fla. Aug. 12, 2019) (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). This is especially true, when as here, defendants have produced thousands of documents. Moreover, EmCyte has not shown that relevant ESI was lost or is unrecoverable due to the defendants' failure to take reasonable steps to preserve it, as they recovered emails from third parties. *See Westgate Resorts v. Reed Hein & Assocs.*, No. 6:18-cv-1088-GAP-DCI, 2021 WL 4428753, *4 (M.D. Fla. Mar. 25, 2021) (for sanctions to be imposed under Rule 37(e), spoliated information must be lost and cannot be restored). Any inference of lost ESI is purely speculative. Indeed, EmCyte concedes as much by acknowledging that "the full extent of lost ESI is impossible to ascertain without a forensic examination." (Doc. 285 at 1-2).

Because EmCyte has not identified responsive ESI that is lost or cannot be recovered, it has come nowhere close to showing that the heavy-handed step of forensically examining the defendants' devices is warranted. The court has imposed sufficient sanctions against the defendants for their discovery violations.  And as of

-16-

today, the defendants have not only produced ESI, but their entire native QuickBooks file. The parties have submitted motions for summary judgment, and the time has come for this case to be decided on its merits.

## IV.   Conclusion

Defendants' motion for partial reconsideration is **GRANTED in part** and **DENIED in part**. (Doc. 296). The court's September 29, 2023 order (Doc. 291) is **VACATED in part** such that the evidentiary hearing contemplated (Doc. 279) therein will not be held because it has become unnecessary. Defendants' motion for relief from EmCyte's non-party subpoenas (Doc. 300) is **GRANTED** such that any outstanding non-party subpoenas issued to Briscoe, Doddo and Associates, CPA, P.A. are quashed. EmCyte's motion for spoliation sanctions against the defendants (Doc. 285) is **DENIED**.

By **April 11, 2024**, defense counsel Patricia M. Flanagan and Alex Louis Braunstein shall file a notice of compliance certifying payment of $1,600 to EmCyte. Furthermore, by **April 11, 2024**, attorneys Flanagan and Braunstein shall file a notice of compliance certifying that *after the date of this order* they read or reread: (1) the Oath of Admission to The Florida Bar, (2) The Florida Bar Creed of Professionalism, (3) The Florida Bar Professionalism Expectations, and (4) the Guidelines for Professional Conduct by the Trial Lawyers Section of The Florida Bar.

By **April 25, 2024**, attorneys Flanagan and Braunstein shall also file a notice of compliance certifying that they have completed the following CLE courses, which shall be *in addition to* their minimum CLE obligations with the Florida Bar:

"Candor Towards the Tribunal" (course number 7504)

"Building a Gold Reputation" (course number 3250)

"Professionalism and Civility in Practice" (course number 6779)

"A Conversation About Professionalism" (course number 4173)

"The State of Professionalism in the Legal Industry" (course number 4805)

"Ten Ways to Avoid Bar Discipline" (course number 3101)

**ORDERED** on March 28, 2024

NICHOLAS P. MIZELL
United States Magistrate Judge

-18-